Filed 10/22/21  P. v. Mata CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B301460 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA466152) |
| v. | |
| ALFREDO MATA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Stephen A. Marcus, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Colleen M. Tiedemann, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Alfredo Mata appeals the judgment entered following a jury trial in which he was convicted of 12 counts of sexual abuse of his girlfriend's two daughters, both minors who were under the age of 10 at the time of the offenses.[1]  The trial court sentenced Mata to an aggregate term of 160 years to life.

During trial a clinical psychologist testified as an expert about Child Sexual Abuse Accommodation Syndrome (CSAAS). Appellant contends:  (1) the admission of the CSAAS evidence was highly prejudicial and should have been excluded as a novel and unreliable scientific theory that has not gained general acceptance in the scientific community; (2) the trial court improperly admitted expert testimony regarding case-specific behavior in connection with the CSAAS evidence; (3) CALCRIM No. 1193 misstates the law and impermissibly permitted the jury to determine guilt based on CSAAS; (4) the trial court erred by precluding testimony regarding specific instances of one of the complaining witnesses' dishonesty; and (5) the cumulative effect of the foregoing errors requires reversal.  We disagree and affirm.

---

[1] The jury convicted appellant of four counts of intercourse or sodomy with a child 10 years old or younger (Pen. Code, § 288.7, subd. (a) (undesignated statutory references are to the Penal Code), counts 1, 2, 8, 9); four counts of oral copulation or sexual penetration with a child 10 years old or younger (§ 288.7, subd. (b), counts 3, 4, 5, 10); and four counts of committing a lewd act on a child (§ 288, subd. (a), counts 6, 7, 11, 12).  The jury also found true multiple victim allegations as to counts 6, 7, 11, and 12 pursuant to section 667.61, subdivisions (b) and (e).

# FACTUAL BACKGROUND

Evelyn V. and appellant began dating[2] when Evelyn's daughters, Isabella and Camilla, were four and five years old, respectively. Approximately two years later in June 2015, appellant moved in with Evelyn and her children. He moved out in November 2016.

*Camilla*

Camilla testified that appellant began sexually abusing her when she was six or seven years old, and the abuse continued until she was eight or nine years old. On multiple occasions he touched her breasts and vagina under her clothes. He kissed her on the lips and licked her breasts and her vagina. He put his fingers and his penis inside her vagina and one time he put his penis inside her anus. He repeatedly told Camilla not to tell her mother. Camilla did not tell anyone because she was scared something would happen if she did, and she worried that people would think bad things about her.

One day, when she was seven or eight years old, Camilla was playing tag outside with a neighborhood friend and ran past her mother's bedroom window. Through an opening in the curtains, Camilla saw appellant on top of Isabella, who was lying naked on her back on the bed. Appellant was standing between Isabella's legs in front of her. Camilla was scared for her sister.

On July 4, 2016, Camilla told her mother that appellant had been touching her inappropriately. She did not, however, tell her mother everything appellant had done to her because she was scared. Evelyn responded that if Camilla was telling the truth, they should go to the police. Evelyn then called appellant into

---

[2] Evelyn and appellant had previously dated. Their son, Jericho, was born in 2001.

the room and told him what Camilla had said. Appellant denied everything and said they should go to the police, but Camilla declined, saying, " 'Okay. Just leave it like that.' " Evelyn later asked Isabella if appellant had ever touched her inappropriately. Isabella responded, " 'I have nothing to say.' "

After Camilla reported the abuse to her mother, appellant continued to live in the home for four more months. He moved out on November 28, 2016, but still came to the house occasionally. Evelyn remained in contact with him because he was Jericho's father.

In January 2018, Camilla's tutor noticed that she looked worried and sad and she was not doing her work. The tutor asked Camilla if she was okay. Stuttering and nervous, Camilla said she did not feel well and wanted to go to the nurse. When the tutor asked what was wrong, Camilla said, " 'It's my mom's boyfriend.' " Camilla told the tutor appellant tried to touch her,[3] and even though she had spoken with her mom about it, appellant was still coming to the house.

That day, Camilla spoke with a police officer and the principal in the school office. She told them that appellant had touched her body inappropriately, but she did not elaborate because she was nervous and scared, and it was difficult for her to talk about.

*Isabella*

Isabella was eight years old when appellant moved in with her family. Isabella testified that during the time appellant lived in the home he touched her "private part" on numerous occasions. The first time, appellant led Isabella into her brother's bedroom,

---

[3] Camilla testified at trial that she told the tutor appellant had assaulted her, without providing any details.

4

had her lie down on the bed, and closed the door. He then touched her front "private part" under her clothes with his hands. Isabella did not tell anyone what had happened because she was nervous and did not know what to do. The second time appellant touched Isabella's front "private part" under her clothes with his hand she was lying on the bed in her brother's bedroom and the door was closed. She was eight or nine years old.

On another occasion, appellant led Isabella into the backseat of a car parked behind the house. There, he pulled her pants down and rubbed both her front and back "private parts" with his hand. Isabella felt bad after the incident and did not tell anyone about it. Isabella also described an occasion when appellant led her into the bedroom she shared with her sister, removed her pants and underwear, and rubbed her front "private part" with his hand.

Appellant also penetrated Isabella's vagina with his penis. The first incident occurred in Jericho's bedroom with the door closed. Isabella was lying on the bed and appellant was about six inches to a foot away from her. She could see appellant's "private part." After removing her skirt and underwear, appellant touched Isabella's front "private part" with his hand and then put his "private part" inside her. It felt bad and painful. Isabella told appellant to stop but he ignored her and "just kept going." Isabella was too nervous and scared to tell anyone what had happened. On two other occasions appellant put on a condom before putting his penis in Isabella's vagina.

Isabella cried during her testimony and several times explained that what happened with appellant was hard to talk about.

*Interviews of Isabella and Camilla*

On March 2, 2018, both Camilla and Isabella were interviewed by Harriet Kerr, a child advocate from Stuart House.[4] Portions of the video from these interviews were played for the jury.

During her interview, Camilla reported that appellant sometimes kissed her using his tongue and put his penis in her mouth. He once hit Camilla and locked the door when she tried to leave the room. He frequently tried to get her to touch his penis. Camilla told Kerr she was worried that people would think her mother was "not good" and that she would be separated from her mother. At trial, Camilla admitted she was not sure if she told "all the truth" during her interview with Kerr, but she confirmed that she was telling the truth in court.

Isabella told Kerr that after appellant moved in, he started taking Camilla into the bedroom and locking the door when their mother was out. Isabella said, "He did it to me, too. [¶] . . . [¶] Um, he would lock the door, when my mom wasn't there. [¶] . . . [¶] And then like he would touch me in places where he shouldn't, like my sister." During her interview Isabella also described other acts of sexual abuse by appellant. But she admitted on cross-examination some difficulty of recollection as well as her tendency to agree with Kerr so she could get the interview over with.

---

[4] Los Angeles Police Officer Jason Kim, an investigating officer at Stuart House, described Stuart House as "a multi disciplinary team . . . of detectives[,] . . . deputy district attorneys, children['s] social workers, . . . [and] some victim advocates from U.C.L.A."

*The prior sexual abuse of Teresa Cruz*

Teresa Cruz testified pursuant to Evidence Code section 1108.[5]  At the time of trial, Cruz was 22 years old.  As a young child Cruz lived with her mother, her brothers, and appellant, who was her stepfather.  When Cruz was eight years old the family moved from Los Angeles to a house in Fresno, where Cruz had her own bedroom.  Her mother worked the night shift at a restaurant, leaving for work around 4:00 p.m. and returning home around 1:00 or 2:00 a.m.  When Cruz was about nine years old, appellant began coming into her bedroom while her mother was at work.  He would hug her from behind and touch her nipples and breast area.  He did this repeatedly on more than 10 occasions.  This made Cruz very uncomfortable, but appellant ignored her requests that he stop.

When Cruz was 10 years old, appellant came into her room and began touching her breasts as he had before.  But this time he removed both his and Cruz's pants and put his penis between her thighs.  When Cruz told him to stop, he refused.  And when Cruz threatened to tell her mother if he did not stop, he responded, " '[I]f you do, I will do something to you.' "  Cruz was very scared.  Appellant did the same thing on another occasion when Cruz was 10 years old.

The third time appellant repeated the removal of his own and Cruz's pants, Cruz was 12 years old.  This time, he held her

---

[5] Evidence Code section 1108, subdivision (a) provides:  "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."

tightly and tried to put his penis inside her vagina. Cruz started crying and told him she did not want to do this. She pushed him away, and he left Cruz's bedroom.

At the time, Cruz did not tell anyone about these incidents because she felt no one would believe her. After the last incident, appellant lived in the home with Cruz and her family for two more years, and moved out when Cruz was 15 years old. During an argument with her mother after appellant had moved out, Cruz told her mother what appellant had done and they reported the abuse to the police.

*Defense*

Appellant testified in his own behalf and denied sexually abusing Isabella, Camilla, or Cruz. He testified that he and Camilla argued daily because she did not like that he imposed rules in the household. These rules included not being disrespectful to her mother, no jumping on the couch, no eating in the living room, putting belongings away after school, and wearing shoes outside. He testified that Cruz also began to push for more freedom when she was 12 or 13 years old. Appellant did not allow it, and they argued a lot.

## DISCUSSION

### I. The Trial Court Properly Admitted the CSAAS Evidence

Appellant contends the trial court abused its discretion in admitting the highly prejudicial CSAAS evidence because the model fails the *Kelly* test.[6] He argues that the CSAAS model

---

[6] "Formerly known as the *Kelly-Frye* rule, based on the rulings of *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, the rule is now the *Kelly* rule in California after changes to the Federal Rules of

constitutes a novel and unreliable scientific theory that has not gained general acceptance in the scientific community, and the admission of expert testimony based on CSAAS resulted in a violation of appellant's state and federal constitutional rights. We disagree. [7]

### A. Relevant background

Clinical psychologist Jayme Jones testified as the final witness for the prosecution. Dr. Jones explained that CSAAS is a model created primarily to clarify common misconceptions with regard to victims' delayed disclosure of child sexual abuse. Although the word "syndrome" is in the name, CSAAS is not a diagnostic test, but rather a description of behaviors to aid in understanding why children may not immediately disclose sexual abuse.

Dr. Jones testified that CSAAS consists of five categories of common behaviors exhibited by victims of child sexual abuse: secrecy, helplessness, accommodation, delayed disclosure, and recantation. Dr. Jones described each category, but explained that not all victims necessarily experience all five parts of the model. She testified that the most common behavior of a child sexual abuse victim "is to never tell anybody" about the abuse. If a victim does tell someone, disclosure is typically not made until

---

Evidence that superseded *Frye*." (*People v. Nieves* (2021) 11 Cal.5th 404, 442, fn. 8.)

[7] The Attorney General argues that appellant's *Kelly* argument is forfeited because he failed to raise it during trial. While not expressly identifying *Kelly* as a basis for his objection, appellant argued that the evidence was unreliable and irrelevant. This is sufficient for us to consider the *Kelly* argument on its merits.

months or even years after the fact, and the revelations "tend to come a little at a time," depending on the reaction of the person to whom the abuse is disclosed.

On both direct and cross-examination Dr. Jones testified that the CSAAS model cannot be used to determine if abuse has occurred or whether a person is telling the truth about abuse. She also confirmed the model was not developed to be used to aid a jury in determining whether abuse occurred. Dr. Jones stated that she did not interview any of the victims in the case, she did not read any reports associated with the case, and she did not prepare any report of her own. She also testified that she could not opine as to the truth of the allegations in the case or the veracity of any of the witnesses.

*B. CSAAS evidence is not subject to Kelly analysis*

Appellant contends the trial court erred in admitting testimony based on CSAAS because CSAAS is a novel scientific theory that has not gained general acceptance in the scientific community. Appellant argues that because CSAAS does not meet the *Kelly* test's criteria for reliability, it is inadmissible as a matter of law. We disagree.

Under the *Kelly* test, admission of evidence derived from a " 'new scientific technique' " requires proof that " 'the technique is generally accepted as reliable in the relevant scientific community.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 315, quoting *People v. Bolden* (2002) 29 Cal.4th 515, 544.) The term "new scientific technique" defies fixed definition due to the constantly evolving nature of science and scientific understanding, and courts apply two principles to determine whether proffered evidence must be subjected to analysis under *Kelly*. (*Jackson*, at p. 316.) " 'First, [*Kelly*] only applies to that

10

limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' " (*Ibid*., quoting *People v. Stoll* (1989) 49 Cal.3d 1136, 1156 (*Stoll*).) "Second, a *Kelly* hearing may be warranted when 'the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury.' " (*Jackson*, at p. 316; *Stoll*, at p. 1156.) We review de novo the question whether a given scientific technique is subject to the *Kelly* test. (*Jackson*, at p. 316.)

Under these principles, CSAAS evidence is subject to exclusion under *Kelly* only if it is offered " 'to prove that a molestation actually occurred.' " (*People v. Wells* (2004) 118 Cal.App.4th 179, 188, quoting *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.) First, CSAAS is neither new to science nor the law. In fact, the CSAAS evidence appellant challenges "has been ruled to be properly admitted by the courts of this state for decades." (*People v. Munch* (2020) 52 Cal.App.5th 464, 472 (*Munch*); *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 (*McAlpin*); *People v. Lapenias* (2021) 67 Cal.App.5th 162, 173 (*Lapenias*); *People v. Bowker* (1988) 203 Cal.App.3d 385, 389, fn. 3 (*Bowker*) [CSAAS dates back to at least 1983].) Plainly, CSAAS does not fall into the first category of evidence to which *Kelly* applies.

Second, California courts have strictly limited admission of CSAAS evidence (and analogous models such as battered person's syndrome and rape trauma syndrome) to disabusing a jury of commonly held misconceptions about how a child reacts to a molestation, " 'and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' "

11

(*McAlpin*, *supra*, 53 Cal.3d at p. 1301; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088 (*Humphrey*); *Lapenias*, *supra*, 67 Cal.App.5th at p. 171.)  Thus, while "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused[,] it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin*, at p. 1300; *Munch*, *supra*, 52 Cal.App.5th at pp. 466, 468; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82 (*Coffman and Marlow*) [psychological expert may not testify about rape trauma syndrome in order to prove that a rape actually occurred, but "such testimony is admissible to rehabilitate the credibility of the complaining witness against a suggestion that her behavior after the assault—such as a delay in reporting it—was inconsistent with her claim of having been raped"]; *People v. Bledsoe* (1984) 36 Cal.3d 236, 247–248, 251.)

With this limitation, expert testimony based on CSAAS does not purport to provide a definitive truth, but "is 'based on [the expert's] clinical experience with child sexual abuse victims and on [his or] her familiarity with professional literature in the area.' " (*Munch*, *supra*, 52 Cal.App.5th at p. 473, quoting *People v. Harlan* (1990) 222 Cal.App.3d 439, 449 (*Harlan*).)  Such expert testimony meets "traditional standards for competent expert opinion, without need for additional screening procedures [under *Kelly*]" (*Stoll*, *supra*, 49 Cal.3d at p. 1161), and is therefore not

12

subject to the *Kelly* rule[8] (*Munch*, at p. 473; *Lapenias*, *supra*, 67 Cal.App.5th at p. 173; *Harlan*, at p. 449 ["The [*Kelly*] rule does not apply to [CSAAS] evidence"]).

---

[8] Appellant cites cases from eight jurisdictions that have limited or banned entirely the use of CSAAS testimony on the ground that it lacks reliability, and invites us to do the same. He also argues that the California Supreme Court has not resolved the issue of whether CSAAS meets the *Kelly* test. In *Munch*, however, our colleagues in Division Six observed that our Supreme Court has already "ruled that CSAAS evidence 'is admissible to rehabilitate [a child] witness's credibility when the defendant suggests that the child's conduct after the incident— e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.' (*People v. McAlpin, supra*, 53 Cal.3d at p. 1300.)" (*Munch*, *supra*, 52 Cal.App.5th at p. 468; see also *People v. Brown* (2004) 33 Cal.4th 892, 906; *Coffman and Marlow*, *supra*, 34 Cal.4th at p. 82; *Humphrey*, *supra*, 13 Cal.4th at p. 1088.)

Division Six declined Munch's invitation to abrogate *McAlpin* based on several of the sister state opinions upon which appellant relies. (*Munch*, *supra*, 52 Cal.App.5th at pp. 469–472.) Noting our Supreme Court's recognition that " '[t]he great majority of courts approve such expert rebuttal testimony' " and its determination that CSAAS evidence is admissible (*McAlpin, supra*, 53 Cal.3d at pp. 1300–1301), *Munch* observed that the Supreme Court decision in *McAlpin* remains binding on all lower courts in this state. (*Munch*, at p. 468, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court"].) As *Munch* concluded, simply because "other jurisdictions may disagree with it does not change its impact on California cases." (*Munch*, at p. 468.)

13

## II. The Trial Court Did Not Abuse Its Discretion in Admitting Expert Testimony Based on CSAAS

Appellant contends that the prosecutor improperly elicited expert testimony based on CSAAS "that went directly to the question of whether these complaining witnesses were abused." He argues that because the expert's testimony was used to apply the CSAAS theory to case-specific behaviors, its admission violated his Sixth and Fourteenth Amendment rights. We disagree.

*A. The trial court properly limited the scope of testimony regarding CSAAS*

The CSAAS evidence was relevant to Isabella, Camilla, and Cruz, each of whom made delayed disclosures of appellant's abuse, disclosed the abuse in a piecemeal fashion, and/or recanted or avoided discussing some of the abuse. We conclude the trial court properly limited the expert testimony based on CSAAS to address these issues.

" 'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.' " (*People v. Duong* (2020) 10 Cal.5th 36, 60; *McAlpin, supra*, 53 Cal.3d at p. 1299.)

The danger that the jury will misapply CSAAS testimony "is . . . present where the expert gives 'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused." (*Bowker, supra*, 203 Cal.App.3d at p. 393.) Accordingly, "the evidence must be targeted to a specific 'myth' or 'misconception' suggested by the

14

evidence."**9** (*Id*. at pp. 393–394.) And "the better practice is to limit the expert's testimony to observations concerning the behavior of abused children as a class and to avoid testimony which recites either the facts of the case at trial or obviously similar facts." (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1384.)

Appellant does not take issue with Dr. Jones's comprehensive explanation of the five parts of CSAAS, but identifies certain portions of her testimony as improperly case specific. The challenged testimony includes: (1) whether a child who is met with disbelief or skepticism after disclosing sexual abuse may delay further disclosure (yes); (2) whether it is common for sexually abused children not to speak out, scream, or verbalize discomfort (yes); (3) when the abuser is someone in the family, whether it is common for the victim to immediately disclose the abuse (no); (4) whether all victims go through each part of the model (no); (5) the percentages of children who disclose abuse within the first year (10 to 15 percent) and in years one through five (an additional 20 to 25 percent); and (6) whether after disclosure, it is common for a child to reach a point of not wanting to talk about it anymore (yes).**10**

---

**9** "Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 (*Patino*).)

**10** Appellant also appears to complain about portions of Dr. Jones's testimony to which the trial court sustained

In overruling appellant's objections to this testimony, the trial court found that Dr. Jones was applying the CSAAS model to describe the behavior of children as a class and their common reactions to sexual abuse, rather than the specific conduct of the children involved in this case. Although some of the expert's testimony happened to correspond with these children's actual behavior, we find no abuse of discretion in the trial court's conclusion that the testimony helped explain behaviors common to victims of child sexual abuse that might appear to a jury to be self-impeaching and contradictory. (*McAlpin*, *supra*, 53 Cal.3d at p. 1301; see *Humphrey*, *supra*, 13 Cal.4th at p. 1088 [expert testimony in battered women's syndrome case necessary " 'to explain a behavior pattern that might otherwise appear unreasonable to the average person' " and place " 'the behavior in an understandable light' "]; *Harlan*, *supra*, 222 Cal.App.3d at p. 450.) Dr. Jones's testimony was not so specific to these children as to run afoul of the prohibition on case-specific expert testimony, and it was properly admitted.

B. *Any error in the admission of the expert testimony was harmless*

Any risk that the jury might improperly infer abuse from the CSAAS testimony was all but eliminated by the many instances in which the jury was told that it could not rely on the expert's testimony to find the children had in fact been sexually abused. Not only did Dr. Jones deny any familiarity with the

---

objections. However, the trial court instructed the jury to ignore questions to which it sustained objections, and we presume the jury followed this instruction. (See *Coffman and Marlow*, *supra*, 34 Cal.4th at p. 83.) Appellant's argument with respect to these portions of Dr. Jones's testimony is therefore moot.

facts or witnesses in the case, she also specifically testified that the CSAAS model is not used to determine if abuse has occurred or to help a jury determine whether a witness is telling the truth. Dr. Jones had no opinion as to whether any of the witnesses in this case were telling the truth.

Further, defense counsel emphasized in closing argument that CSAAS is "not meant to diagnos[e] whether somebody is a victim of sexual abuse. It does not help anybody determine whether a child is telling the truth . . . about being sexually abused. It is simply a tool that is used by mental health professionals to help them decide how to treat somebody who is a confirmed victim. [¶] . . . [Mental health professionals] can assume something that a jury in a criminal trial cannot do, which is they assume that the person they are working with is, in fact, a victim of child sexual abuse. [¶] So don't get tempted to go back into the jury room and say, 'well, she didn't say right away, that means that she was sexually abused,' that is not the purpose of that testimony." Urging the jury to reject Dr. Jones's testimony altogether, counsel continued: "There is no scenario that you can think of that [Dr.] Jones would not tell you is consistent with sexual abuse. [¶] With respect to your own job here, [Dr. Jones's] testimony is not helpful, because you cannot assume, as [Dr. Jones] does in her work, that the testimony that you're hearing is true, and that the witnesses were telling the truth. [CSAAS] was not meant to be used in a criminal trial, and just a reminder not to use it as some sort of diagnosis, that something did or did not happen."

Finally, the trial court properly instructed the jury that Dr. Jones's testimony did not constitute evidence of appellant's guilt and could be used only for the limited purpose of deciding

whether the conduct of Camilla, Isabella, and Cruz was consistent with the conduct of someone who has been molested and evaluating the believability of the testimony of each of the three witnesses.

In this context, any possible error in admitting Dr. Jones's testimony must be deemed harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*) [no reasonable probability that the outcome would have been different in the absence of the alleged error].)

*C. The prosecutor did not improperly urge the jury to infer guilt based on the CSAAS evidence*

Appellant further contends that the prosecutor's closing argument improperly urged the jury to apply the CSAAS evidence to find appellant guilty, violating his due process rights and requiring reversal. Appellant's failure to object to the prosecutor's argument forfeited the issue for appeal. (*People v. Hoyt* (2020) 8 Cal.5th 892, 944 [defendant forfeits any challenge to prosecutor's argument by failing to object].) Furthermore, nothing in the prosecutor's statements to the jury supports appellant's allegation that "[t]he prosecution repeatedly urged the jury to use Dr. Jones' testimony diagnostically to find that the sexual molestation actually occurred."

In discussing Isabella's revelations about appellant's abuse, the prosecutor stated: "You might ask yourself, 'well, why didn't Isabella tell anybody what the defendant had done immediately?' [¶] Well, keep in mind, you heard from Dr. Jones that delayed disclosure is not uncommon for children who experience sexual abuse." Far from urging the jury to leap to the conclusion that Isabella was abused as appellant asserts, the prosecutor's

18

argument plainly falls within the permissible application of CSAAS evidence: rehabilitation of Isabella's credibility in light of her seemingly self-impeaching behavior, that is, delayed disclosure of the abuse.

Similarly, in discussing the delays by Camilla and Cruz in disclosing the abuse, the prosecutor pointed out that Dr. Jones had explained that this sort of behavior is not uncommon because the child does not know if he or she will be believed. The prosecutor observed that both Camilla and Cruz had this experience. Again, the prosecutor's argument did not urge the jury to use CSAAS diagnostically to find that appellant had sexually abused these girls. Rather, it properly sought to bolster the credibility of these witnesses by explaining their delayed disclosure.

"The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.) The CSAAS evidence admitted here was relevant to the issues presented and, as it was properly limited, did not render appellant's trial fundamentally unfair. (See *Patino*, *supra*, 26 Cal.App.4th at p. 1747 [the admission of CSAAS evidence does not render a trial fundamentally unfair].) Appellant suffered no violation of his due process rights.

### III. CALCRIM No. 1193 Is a Legally Correct Instruction

The trial court instructed the jury pursuant to the pattern jury instruction[11] CALCRIM No. 1193. Appellant contends that

---

[11] "The California jury instructions approved by the Judicial Council are the official instructions for use in the state of California." (Cal. Rules of Court, rule 2.1050(a).)

19

CALCRIM No. 1193 misstates the law and impermissibly permitted the jury to determine guilt based on the CSAAS evidence. Appellant's failure to object to the instruction below forfeited this argument on appeal. (*People v. Lucas* (2014) 60 Cal.4th 153, 291, fn. 51 [failure to object to alleged instructional error generally forfeits issue on appeal]; see *People v. Maury* (2003) 30 Cal.4th 342, 426 [error cannot be predicated on trial court's failure to modify instruction on its own motion where defendant did not request any such amplification or explanation].)

Appellant's argument also fails on its merits.

In accordance with CALCRIM No. 1193, the court instructed the jury: "You have heard testimony from Dr. Jayme Jones regarding child sexual abuse accommodation syndrome. [¶] Dr. Jones' testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Camilla V.'s, Isabella V.'s, and Theresa Cruz's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of the testimony of each of the three above named witnesses."

Appellate courts have rejected challenges to CALCRIM No. 1193 similar to those appellant raises here, holding that the instruction accurately informs the jury on the limited use of CSAAS evidence. These courts have uniformly found the instruction does not improperly allow the alleged victim of child sexual abuse to corroborate her or his own testimony, violate the defendant's due process rights, or misapply or lessen the prosecution's burden of proof. (*Lapenias, supra*, 67 Cal.App.5th

20

at p. 175; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504; *Munch*, *supra*, 52 Cal.App.5th at pp. 473–474.) Other jury instructions given also limited the danger that the jury would use the CSAAS testimony for an improper purpose. (See, e.g., CALCRIM No. 226 [instructing that it is the jury's duty to determine the credibility of witnesses]; CALCRIM No. 303 [limiting the use of certain evidence].)

## IV. The Trial Court Did Not Abuse Its Discretion by Limiting Purported Impeachment Evidence

Appellant contends the trial court erred by precluding testimony regarding specific instances of Camilla's dishonesty for impeachment. We disagree.

### A. *Relevant background*

Evelyn testified concerning her relationship with appellant, the dates he lived at her house, her perception of appellant's relationship with Camilla, as well as Camilla's disclosure of appellant's sexual abuse. On cross-examination, defense counsel asked if Evelyn had an opinion as to whether Camilla was an honest person. After the prosecutor objected, Evelyn testified outside the presence of the jury that Camilla tended to lie about "the daily things having to do with daily life. Nothing important."

Citing Evidence Code section 787, the trial court ruled that neither counsel could ask about specific examples of Camilla's dishonesty. The court added: "I'm certainly not going to let you get close to having her offer an opinion about whether or not her claims, meaning Camilla's claims, are true or not. You're not allowed to do that, and I mean, it seems to me that's what you're trying to do." The court declared, "This isn't what the case is supposed to be about," and emphasized it would not permit

defense counsel to belabor the point and any questioning on the subject was to be brief.

Evelyn then testified before the jury that, during the period from 2015 to 2016, she did not consider Camilla to be an honest person. She conceded, however, that Camilla did not lie about everything.

*B. The trial court did not err in excluding evidence of specific instances of Camilla's untruthfulness*

Appellant contends the trial court erred in excluding specific instances of Camilla's dishonesty pursuant to Evidence Code section 787. He asserts the error violated his rights to confrontation and due process, requiring reversal. To the extent the trial court's ruling excluding such evidence rested solely on Evidence Code 787, the trial court erred. (See *People v. Dalton* (2019) 7 Cal.5th 166, 214 (*Dalton*).) But because the trial court was authorized to exclude the evidence of specific instances of Camilla's dishonesty pursuant to Evidence Code section 352 and implicitly did so, we conclude any error in limiting the impeachment evidence under Evidence Code section 787 was harmless. (*Watson, supra*, 46 Cal.2d at p. 837.)

Before June 1982, Evidence Code section 787[12] had long been interpreted to proscribe proof of specific instances of a witness's conduct to impeach the witness's credibility, regardless

---

[12] Evidence Code section 787 provides: "Subject to [Evidence Code] Section 788 [allowing the credibility of a witness to be attacked with evidence of a felony conviction], evidence of specific instances of [a witness's] conduct relevant only as tending to prove a trait of [the witness's] character is inadmissible to attack or support the credibility of a witness." (See *Dalton, supra*, 7 Cal.5th at p. 213.)

of the relevance of such evidence. (See *People v. Wagner* (1975) 13 Cal.3d 612, 618–619; *People v. Lankford* (1989) 210 Cal.App.3d 227, 235; see also *People v. Eldridge* (1905) 147 Cal. 782, 786 [although evidence of prior felony conviction is admissible to impeach a witness's credibility, details and circumstances of the offense are not].) However, with the enactment of Proposition 8 in 1982, which added the "Right to Truth-in-Evidence" provision to California's Constitution, all "relevant" proffered evidence became admissible. (Cal. Const., art. I, § 28, subd. (f)(2) (§ 28(f)(2));[13] *Dalton*, *supra*, 7 Cal.5th at p. 213.)

Our Supreme Court has explained that "the enactment of article I, section 28, subdivision ([f]) of the California Constitution 'supersedes all California restrictions on the admission of relevant evidence except those preserved or permitted by the express words of section 28([f]) itself.' [Citation.] Among those provisions superseded is Evidence Code section 787." (*In re Freeman* (2006) 38 Cal.4th 630, 640, fn. 5; *Dalton*, *supra*, 7 Cal.5th at p. 214; *People v. Harris* (1989) 47 Cal.3d 1047, 1081 ["section 28[(f)(2)] contains no . . . exception that would preserve the exclusionary rule of Evidence Code sections 786–790, when the evidence relates to a witness's conduct, but is offered to attack or support the credibility of the witness"].) Article I, section 28, subdivision (f)(2) of the California Constitution thus abrogates Evidence Code section 787's exclusion of specific instances of misconduct that have "any

---

[13] This provision was originally codified at article I, section 28, subdivision (d), but was subsequently redesignated as section 28, subdivision (f)(2). (*People v. Capers* (2019) 7 Cal.5th 989, 1002, fn. 6.)

23

tendency in reason" (Evid. Code, § 210) to impeach a witness's credibility (*Dalton*, *supra*, 7 Cal.5th at p. 214).

The trial court erred in excluding under Evidence Code section 787 evidence of specific instances of Camilla's untruthfulness to attack her credibility. However, as our courts have long held, "a trial court's order will ordinarily be upheld if it is legally correct on any basis." (*Conservatorship of McQueen* (2014) 59 Cal.4th 602, 612; *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 ["No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion"].) Here, even though the trial court cited an invalid basis for limiting the impeachment evidence, we will uphold the ruling because the evidence was subject to exclusion on a valid ground.

The "Right to Truth-in-Evidence" amendment to the constitution did not strip trial courts of all discretion to exclude any relevant evidence, no matter how slight its probative value. Thus, under Evidence Code section 352, trial courts retain the discretion to exclude even relevant evidence " 'if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*Dalton*, *supra*, 7 Cal.5th at p. 214; Cal. Const., art. I, § 28, subd. (f)(2) ["Nothing in this section shall affect any existing statutory rule of evidence

24

relating to privilege or hearsay, or Evidence Code Sections 352, 782 or 1103"].)

Here, although the trial court did not cite Evidence Code section 352 in making its ruling, it implicitly excluded evidence of specific instances of Camilla's alleged dishonesty under that statute. In light of defense counsel's inability to identify any example of Camilla's dishonesty that would have been probative, and Evelyn's in camera testimony that Camilla had lied only about unimportant matters, "things having to do with daily life," the court was clearly concerned that any probative value of Evelyn's testimony would confuse or mislead the jury, waste time, and be outweighed by undue prejudice. (See *People v. Clark* (2016) 63 Cal.4th 522, 586 (*Clark*).) To avoid these risks, the trial court properly limited the evidence and admonished counsel not "to belabor this," to keep the questioning "minimal," and not to "go[] beyond the basic two or three questions." The court concluded its ruling by stating, "This is not what the trial centers on."

A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of that discretion. (*Clark*, *supra*, 63 Cal.4th at p. 586.) In determining abuse, "[w]e examine the trial court's decision to determine whether the court ' "exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice." ' " (*People v. Schultz* (2020) 10 Cal.5th 623, 668.) We find no such abuse of the court's discretion here.[14]

---

[14] We also reject appellant's claims that the trial court's ruling violated his constitutional rights to due process and confrontation. As our Supreme Court has held, the routine application of the ordinary rules of evidence "does not implicate a

25

## V. There Was No Cumulative Error

Finally, having found no errors that individually or collectively deprived appellant of a fair trial, we reject appellant's contention that his conviction should be reversed because of the cumulative effect of the errors identified in his opening brief. (See *People v. Avila* (2009) 46 Cal.4th 680, 718; *People v. Halvorsen* (2007) 42 Cal.4th 379, 422.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



HOFFSTADT, J.

---

criminal defendant's constitutional rights." (*People v. Jones* (2013) 57 Cal.4th 899, 957; see also *Crane v. Kentucky* (1986) 476 U.S. 683, 690 ["we have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted"].)

26